**DRAFT**
**1-4-20**

# IN THE UNITED
# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| BRIAN MARTIN, | ) | Case No. 20-10454 |
| | ) | |
| Debtor. | ) | Judge Baer |
| | ) | |

**AMERICAN HONDA FINANCE CORPORATION'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

## I.    INTRODUCTION

Although the point of a Chapter 7 bankruptcy is to grant Debtor a fresh start, this benefit is not available to those who can afford to pay as much of their indebtedness as possible without hardship.  *See In re Schwartz*, 799 F.3d 760, 763-764 (7th Cir. 2015).  After closing his BBK Motorsport ("BBK") company more than two years ago, Debtor Brian Martin used the uncertainty related to the global COVID-19 pandemic as an opportunity to volunteer for a furlough from his current employment and seek bankruptcy protection to discharge his business debts.  Because Debtor has failed to pay his debts – while he has the clear ability to do so – he is not entitled to the benefit of Chapter 7.

By Debtor's own calculations, his household take-home income of $9,259 per month, for a family of four (including two children ages 11 and 16), already provides a $540 surplus from which his creditors could be repaid.  However, the Debtor's budget, as reflected on Schedules I and J, substantially miscalculates both income and expenses to disguise the household's financial well-being.  Debtor underreports his non-filing spouse's income by between $1,100 and $1,300 per month, even while she diverts 16 percent (over $1,500 per month) of her income into

voluntary 401(k) contributions. Debtor has further suppressed his reported household income by as much as $1,300 per month with income tax withholdings for years in which his family will not owe income taxes; indeed, his recently-filed tax returns for 2018 and 2019 show refunds of $18,656 and $16,299, respectively. In addition, his stated budget is excessive, including duplicative expenses of $810 and $100 in real estate taxes and property insurance that are already included in his mortgage escrow; $960 for childcare and children's education costs that are, in fact, closer to $160 per month; and $750 for therapy expenses that have never exceed $350 per month. Finally, Debtor's actual household expenses, as reflected in Debtor's household bank and credit card statements, are chock-full of optional spending and fail to support Debtor's estimated amounts of essential expenses.

In contrast to the financial position reflected in his petition, Debtor's true financial position reveals more than $5,500 in unreported income, excessive deductions, and misleading expenses, or an additional $66,000 a year that could paid to creditors.[1] And since the filing of his bankruptcy petition, the Debtor has returned to work and been promoted to a new position. At the time of his 2004 examination on December 2, 2020, Debtor was negotiating for a salary increase, which he hoped would bring his annual compensation in the range of $100,000. *See* Brian Martin Transcript at 19-24, attached as Ex. A. Even if the expected salary increase falls short of Debtor's expectations and he receives no increase, he and his non-filing spouse will have gross household income of approximately $175,000 on an annual basis, or $14,583 a month.

---

[1] While most errors and omissions in Debtor's budget disguise his financial well-being, Debtor also fails to schedule his car payment of $400 per month. A $400 per month deduction is, therefore, included in this calculation.

## II.    STANDARD FOR DISMISSAL UNDER §707(a)

In *Schwartz*, the Seventh Circuit explained that a dismissal under §707(a) does not require a finding of bad faith on the part of a debtor. Instead, the relevant inquiry is only whether debtor was "unjustified in the refusal to pay one's debts." 799 F.3d at 764. In the *Schwartz* case, debtors filed a petition under Chapter 7 while disclosing on Schedule I that they earned approximately $11,000 per month in gross wages for a family of four, including two children age 2 and 5.

The debtors in *Schwartz* had income that included gross income from rental property; however, the income disclosed from the property ($2,200 per month) was either partially or entirely offset by expenses from the rental property. Schedule J listed "Mortgage (rental)" of $1,600, "Second Mortgage (rental)" of $200, and "Association Fees" of $450 per month. While the bankruptcy court treated the debtors net monthly income as $9,549, this calculation is based on the gross wages minus payroll withholdings, plus the gross rental income (without deduction for expenses of the rental property). Official Form B106I (Schedule I), which was revised on December 1, 2015, now lists "*Net* income from rental property…" [emphasis added]. On a current Schedule I, the Schwartz Debtors' monthly net income would likely be under $7,350 per month.

In noting that the Schwartz Debtors had not *changed* their standard of living, the Seventh Circuit took issue with the fact that "they just didn't take it down a peg so that there would be some money for their creditors." Explaining that this failure to rein in expenses was itself "sufficient cause for denying a discharge of their debts," the Court reasoned that "[t]hey could so easily have paid them at least in part; they had no excuse for not doing so." *Id.* at 764. And while §707(a) "invites a more open-ended inquiry," id at 763, the Court stressed that

3

"there's no need to consider whether their conduct amounts to 'bad faith'." *Id.*at 764.   Relying on the bankruptcy court's findings that the Schwartz Debtors had failed to pay their creditors while prioritizing non-essential spending, the Seventh Circuit affirmed the dismissal of their Chapter 7 case. *Id.*

Courts also look to the accuracy of the debtor's budget in determining whether "cause" exists to dismiss a case under §707(a). *In re Jakovljevic-Ostojic*, 517 B.R. 119, 129 (Bankr. N.D. Ill. 2014) (Barnes, J.) (holding dismissal appropriate under §707(a) where "materially inaccurate" Schedule J expenses "disguise[d] … financial well-being."). Where a debtor's budget, upon examination, reveals that a debtor actually has the ability to repay creditors without hardship, dismissal is appropriate. *Id*. ("glaring inaccuracy … is a sign of indifference at best, deceit at worst.").

### III.  DEBTOR'S HOUSEHOLD INCOME EXCEEDS THE AMOUNT IDENTIFIED IN THE *SCHWARTZ* CASE

As discussed in more detail below, both Debtor's household gross income and net income exceed that of the debtors in *Schwartz*, and Debtor's household net income would be substantially higher if not for unjustified tax withholding and excessive 401(k) withholding by both Debtor and his non-filing spouse.

#### A.  Debtor's Employment Is No Less Stable Than Any Other Employee in a Global Pandemic; Since His "Furlough," He Received a Promotion and Is Negotiating a Raise.

At the time of filing, Debtor was receiving unemployment benefits. His Schedule I states that he was "furloughed, receiving $1,030/week unemployment compensation; does not know when, or if, employer will reopen, or what compensation will be if it does." Debtor's Rule 2004 examination tells a different story. Debtor testified that his employer Windy City Motors had not, in fact, closed, but rather sought voluntary furloughs during the early days of the pandemic.

4

Ex. A at 31 (Debtor's Deposition, December 2, 2020). Knowing he would receive unemployment benefits, Debtor volunteered for the furlough. *Id.* at 31-33. Debtor also testified that he continued to assist his employer by performing routine tasks remotely while he was ostensibly off work, including processing credit applications and making outgoing phone calls. *Id.* at 33-34.

Debtor's last day of work prior to being furloughed was approximately March 28, 2020, and he received unemployment benefits beginning on April 8, 2020. *See* Exhibit B (Debtor's pay advices). Debtor thereafter returned to work on or about May 17, 2020, less than two months after his voluntary furlough, and less than two weeks after filing this bankruptcy case. *See* Ex. A at 35. After his return to work, Debtor was awarded a promotion to manage the Windy City Motors' Business Development Center. Ex. A at 31. At the time of his testimony, Debtor was in the process of negotiating his raise, which he thought should bring his salary to approximately $100,000. Ex. A. at 19-24. Even without the increase, Debtor resumed earning $2,500 per paycheck, amounting to approximately $5,417 gross income per month, which on an annual basis is a salary of $65,000. Ex. A at 20. After taxes of approximately $500 per check, the Debtor's actual take-home pay was approximately $4,333 – slightly less than what the Debtor was receiving on unemployment. *See* Exhibit C (Schedules I and J); Ex. B.

While the Debtor expressed uncertainty in the petition about his job prospects, this uncertainty is unfounded. The Debtor's job position was secure, as evidenced by the fact that he continued to aid his employer while furloughed; he received a job promotion shortly after returning to work; and he has since had discussions with his employer about substantially increasing his income. Ex. A. at 19-24. Although Debtor expressed some uncertainty about his ability to succeed in his new position, Ex. A at 25, this uncertainty seems less likely for Debtor

5

than for employees in other service industries. The pandemic has reportedly fueled sales in motorsport vehicles, *see* [https://www.roadracingworld.com/news/u-s-motorcycle-sales-boom-despite-pandemic/](https://www.roadracingworld.com/news/u-s-motorcycle-sales-boom-despite-pandemic/) (lasted visited January 8, 2021), and Debtor enjoys a positive relationship with his employer Windy City Motors, having previously worked with many of its store managers and department managers, given Debtor's long history in the industry. *See* Ex. A at 25.

### B.   Debtor Incorrectly Calculates Income; Combined with his Non-Filing Spouse, Debtor's Gross Household Income Exceeds $14,500 a Month.

Debtor's Schedule I indicates that his non-filing spouse, Lara Martin, earns $7,794 per month in gross wages. While Schedule I requires a debtor only to estimate their income, the non-filing spouse's actual gross income exceeds the reported income by a material amount. Mrs. Martin's year-to-date income, as of the April 30th check stub (the latest stub prior to filing this case), was $37,257, based on nine paychecks since the beginning of the year. Accordingly, she earned approximately $8,970 per month, approximately $1,175 more than was disclosed on Schedule I. *See* Exhibit D (non-filing spouse's pay stubs).

This higher income persisted during the year. As of August 20, 2020 – the last paycheck produced by Debtor – Mrs. Martin had earned $71,847 year-to-date, which is approximately $9,157 on average per month, or $1,363 more than was disclosed on Schedule I. Assuming that Ms. Martin continues to earn at the pace she has for the first seven and one-half months of the year, her annual gross income will reach nearly $110,000 on an annual basis.

As a result, the Debtor's gross household income – even assuming that Debtor is unsuccessful in his salary negotiations relating to his promotion – is approximately $175,000 on an annual basis and $14,583 on a monthly basis. Accordingly, Debtor's gross household income on a monthly basis is more than 60 percent over what the *Schwartz* court found sufficient to

dismiss the Schwartz Debtors' bankruptcy case and require payment of their creditors.[2] On a net monthly basis, the understatement of Mrs. Martin's income means there is at least another $1,100 in the household budget that Debtor failed to disclose.

### C. The Household has Excessive 401(k) Contributions

Debtor's Schedule I indicates that his non-filing spouse withholds a significant sum for her 401(k).[3] On the non-filing spouse's latest pre-petition pay advice, dated April 30, 2020, she had withheld $6,022 into her 401(k) account. This appears to be a deduction of approximately 16 percent of her gross pay. Annualized, the non-filing spouse will likely withhold approximately $18,170 toward her 401(k). Indeed, as of August 20, 2020, she has withheld $11,880 so far this year. *See* Ex. D.

The non-filing spouse is not a codebtor in this case. While a non-filing spouse's 401(k) withholdings, as they relate to dismissal under §707(a), may be a matter of first impression, courts consistently consider a non-filing spouse's income and expenses when determining whether a case demonstrates bad faith or abuse in other contexts, such as §707(b) and §1325. *See, e.g., In re Williamson*, 296 B.R. 760, 764 (Bankr. N.D. Ill. 2003) ("Failure to consider the impact of the non-debtor spouse income would leave the debtor's unsecured creditors to subsidize the spouse's expenses.") (Schmetterer, J).

Here, Debtor's spouse is contributing a significant amount of money each month to her 401(k). While there is nothing unreasonable, in the absence of a bankruptcy, about withholding

---

[2] As described previously, the Schedule I form has since been amended to provide that the net income from real property is listed, not gross income.

[3] Schedule I lists the voluntary retirement contributions under line 5d (Required repayments of retirement fund loans), but it is undisputed that the $1,168 amount should appear on line 5c (Voluntary contributions to retirement plans).

7

substantial amounts towards a 401(k), it is unreasonable to seek bankruptcy relief from creditors while the household is also contributing such a significant sum toward voluntary retirement contributions. Debtor has the ability to repay creditors without hardship where the household budget can maintain ample monthly expenses while simultaneously withholding such significant sums for a voluntary 401(k). While the reasonableness of a 401(k) contribution is determined on a case-by-case basis, a decrease to 6 percent, a common amount withheld, would free up over $900 in Debtor's household budget.

      **D.**    **The Household has, and Continues to, Voluntarily Suppress Income by Withholding Taxes that Are Not Owed**

Debtor's Schedule A/B, Line 28, lists an anticipated tax refund with an unknown value, with the note that the asset is for "[a]nticipated 2018/19 tax refund $25k (large carryovers, but withholding paid by [non-filing spouse])." *See* Exhibit E (Schedule A/B). The clear implication of his sworn statement is that Debtor and his spouse have not filed their 2018 and 2019 tax returns, and while the Debtor may have a legal interest in tax refunds for 2018 and 2019, he (and thus the estate) does not have an equitable interest in the funds. An examination of the Debtor's financial records reveals, however, that despite attributing the refunds solely to Mrs. Martin's withholdings, both Debtor and his spouse contributed sizeable tax withholdings for 2019 and continue to do so in 2020. *See, e.g.*, Exhibit F (2019 W-2).

Debtor had not filed his 2018 or 2019 tax returns prior to filing this case. However, in response to AHFC's Rule 2004 examination requests, Debtor and his non-filing spouse finalized and submitted their State and Federal Income Tax Returns for 2018 on or about November 12, 2020, and they expect a $12,459 federal refund and a $6,197 state refund. *See* Exhibit G (select portions of 2018 tax returns). One major reason for these refunds totaling $18,656 is that Debtor

claimed outsized business losses and carried forward additional losses. These large refunds should not have been a surprise to Debtor and his spouse, who carried forward both $7,180 in tax refunds and business losses from their 2017 federal income tax refund. *See* Exhibit H (select portions of 2017 tax returns). Debtor claims he failed to complete his tax returns because he was "horribly depressed about the loss of the business," *see* Ex. A at 42, and he acknowledged that continuing to withhold amounts after 2017 was "stupid." *Id.* at 49. One lesson of *Schwartz*, however, is that there is no need to attribute ulterior motives to Debtor's actions; Debtor and his non-filing spouse over withheld amounts that could have – and should have – been used to pay creditors.

Debtor also finalized and submitted his State and Federal Income Tax Returns for 2019 on or about November 20, 2020, eight days after his 2018 returns were filed. His federal tax return filing results in a $10,115 refund and the state filing amounts to $6,184. *See* Exhibit I (select portions of 2019 tax returns). Debtor's 2019 W2 indicates that he personally withheld $4,370 in federal income taxes and $2,695 in state income taxes. *See* Exhibit F.

The 2019 federal income tax return indicates an adjusted gross income of -$289,491, losses that he would be eligible to carry forward to 2020 and subsequent years. Indeed, the losses carried forward are so great that the household did not need to be withholding for state and federal income taxes in 2020; the losses carried forward would have shielded them from all or partial income tax liability into 2021 and 2022.[4] As a result, for the past three years, including 2020, the Debtor's household has been over-withholding between $900 and $1,400 per month in federal and states taxes.

---

[4] The Tax Cuts and Jobs Act of 2018 limited the net operating loss deduction to 80% of taxable income. H.R. Res. 1, 115th Cong., §13302 (2018), incorporated at 26 U.S.C. §172(a)(2)(A). However, the CARES Act of 2020 temporarily removes this 80% limitation through 2020. H.R. 748, 116th Cong., §2303 (2020).

As of Debtor's most recently produced paycheck of September 18, 2020, he has withheld $4,724 in federal and state income taxes. *See* Exhibit B. Mrs. Martin has withheld $6,709 in federal and state income taxes as of her August 20, 2020 paycheck. *See* Exhibit D. Based on these withheld amounts, Debtor's household is anticipated to withhold approximately $16,692 in federal and state income taxes that would be unnecessary due to the losses carried forward. Thus, the household has been over-withholding by approximately $1,391 per month.

These refunds and withholdings are problematic for two reasons. First, Debtor has specifically attested to a misleading statement - that the tax withholdings are solely attributable to the non-filing spouse - which distorts whether any of these refunds are property of the estate. Second, Debtor and his spouse have spent the last three years withholding, and continue to withhold, amounts that did not need to be withheld for the federal and state taxing agencies. Rather than using this nearly $1,400 per month in household income to repay Debtor's obligations, Debtor's household is instead overpaying the taxing agencies with money that will ultimately be returned to Debtor's household, while simultaneously seeking to discharge the debt owed to his creditors. This is exactly the kind of "deliberate and selfish" behavior that the Seventh Circuit in *Schwartz* found warranted a dismissal, because the Debtor is failing to "pay as much of their indebtedness as they [can] without hardship." *Schwartz*, 799 F.3d at 764.

### IV. DEBTOR'S BUDGET INFLATES ESSENTIAL SPENDING ON MEDICAL AND HOUSING EXPENSES, CONCEALING THE HOUSEHOLD'S FINANCIAL WELL-BEING

Debtor's Schedule I estimates a net household income of $9,259, which, as explained in Sections II and III above, is conservatively understated by between $1,100 and $1,300 in underreported income and $2,200 in excess withholdings. This excess amount grows further

when comparing Debtor's stated expenses to those contained in his actual bank and credit card statements, which he produced in connection with the Rule 2004 examination.

According to Debtor's Schedule J, the household spends $810 for real estate taxes, $100 for property insurance, $1,700 for food and housekeeping supplies[5], $960 for childcare and children's education costs, $630 for transportation, $365 for entertainment, and $750 for a therapist. Debtor testified, however, that the household does not actually spend $810 for real estate taxes and $100 for property insurance; rather, these expenses are paid through their mortgage escrow. Ex. A at 58. Accordingly, Debtor's expenses are overstated by $910 due to this double-counting.

In addition, Debtor estimated $960 per month for childcare and children's education costs; however, a review of the bank statements before and after the bankruptcy indicate that the household's childcare and children's education costs are substantially less – a yearly fee of $464 for school registration, $350 to Debtor's elder child for "several months' worth of babysitting," Ex. A at 73, various afterschool music activities, and preparatory classes for college. *See* Exhibit J (List of Identified Childcare and Child Education Expenses). While Debtor's household pays approximately $104 to the school monthly, this is a school food plan and not educational expenses. *See* Lara Martin transcript at 28, attached as Exhibit K. As a result, the childcare expense appears overstated by at least $800 per month.

Despite compelling testimony about the need for therapy, the documents provided by Debtor simply do not bear out this essential expense of approximately $750 per month for a therapist. A review of the bank and credit card statements before and after the bankruptcy indicate that the household's therapist costs have not exceeded $350 per month, and is much less

---

[5] For comparison, the IRS National Standard for food and housekeeping supplies for a family of four is $1,018.

most months.  *See* Exhibit L (List of Identified Therapy Costs).  Mrs. Martin testified that most therapist costs are covered by insurance and the household contribution is limited to copayment, although there have been instances where the household used providers not covered by their insurance and were required to pay the full cost out of pocket.  *See* Ex. K at 38.  Even taking into account the instances where insurance has not covered these expenses, the documents provided by Debtor do not support the expenses estimated in Schedule J, and Debtor's household income in excess of expenses should increase by at least $400.

When the unverified $2,110 in essential expenses are deleted from Debtor's Schedule J and are added to the undisclosed income and excessive deductions, Debtor's net monthly household income after expenses grows to at least $5,500, which is not being used to repay creditors.  Instead, the credit card and bank statements that Debtor produced show significant expenditures to specialty food stores, eating out, and entertainment.  While the Debtor testified at his §341 meeting that his wife has food allergies, when discussing their high estimated food and housekeeping expense, the non-filing spouse testified that the household does not have any medical or dietary restrictions when it comes to food.  *See* Ex. K at 34-35.

In addition, while Debtor's actual expenses, as described, are based on Debtor's bank statements, he testified at his Rule 2004 examination that he exchanged his paychecks for cash rather than depositing them, because he wished to avoid creditors.  Ex. A at 62.  Accordingly, calculations of pre-petition expenses based on the bank statements omit as much as $4,000 in spending in some months.  While it may be that some of this unaccounted money goes toward the expenses identified as overreported on Schedule J, compared to the bank statements, testimony suggests this amount is not substantial.  *See* Ex. A at 76.

**V. DEBTOR'S BANKRUTPCY SHOULD BE DISMISSED BECAUSE HE HAS SUFFICIENT INCOME TO PAY AS MUCH OF THEIR INDEBTEDNESS AS THEY CAN WITHOUT HARDSHIP**

Accordingly, this case should be dismissed under 11 U.S.C. §707(a) because Debtor has the ability to repay his creditors and has submitted inaccurate bankruptcy schedules that disguise his household's financial well-being.

Dated: January 8, 2021

Respectfully submitted,

AMERICAN HONDA FINANCE CORPORATION

/s/ Dustin B. Allen
One of Its Attorneys

Susan Valentine (No. 6196269)
Dustin Allen (No. 6312451)
VALENTINE AUSTRIACO & BUESCHEL, P.C.
105 West Adams Street, 35th Floor
Chicago, Illinois 60603
Phone: (312) 238-8285
svalentine@vablawfirm.com
dallen@vablawfirm.com