IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| BRIAN MARTIN, | ) | Case No. 20-10454 |
| | ) | |
| Debtor. | ) | Judge Baer |

**AMERICAN HONDA FINANCE CORPORATION'S**
**REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

After "correcting" many of the misstatements in his May 2020 bankruptcy petition, Debtor Brian Martin ("Martin") contends that he is entitled to a discharge of his debts. Although American Honda Finance Corporation ("AHFC") has no quarrel with the "fresh start" that bankruptcy provides to debtors whose situations warrant such relief, such a discharge is inappropriate here, where Martin fails to establish that it would be a hardship to pay even some of the debt he owes. With the more than $175,000 in annual income his household earns, Martin has excess income to pay his creditors without hardship. Accordingly, a "fresh start" in this case is not equitable, and Martin's bankruptcy should be dismissed.

The Seventh Circuit explained in *Schwartz* that for a creditor to prevail on a 11 U.S.C. §707(a) dismissal motion, the movant need not establish that the debtor committed fraud or engaged in a bad faith filing. Instead, the lesson of *Schwartz* is that bankruptcy is not available to those who could have paid their debts at least in part and "had no excuse for not doing so." *In re Schwartz*, 799 F.3d 760, 764 (7th Cir. 2015). "[T]here's no need to consider whether their conduct amounts to 'bad faith.'" *Id.* And although bad faith is not required under §707(a), a debtor's conduct is not irrelevant either. Courts also look to the accuracy of the debtor's budget in determining whether "cause" exists to dismiss a case under §707(a). *In re Jakovljevic-Ostojic*,

517 B.R. 119, 129 (Bankr. N.D. Ill. 2014) (Barnes, J.) (holding dismissal appropriate under §707(a) where "materially inaccurate" Schedule J expenses "disguise[d] … financial well-being."). Where a debtor's budget, upon examination, reveals that a debtor actually has the ability to repay creditors without hardship, dismissal is appropriate. *Id*. ("glaring inaccuracy … is a sign of indifference at best, deceit at worst.").

As discussed below, Martin's corrected filings leave his original inaccuracies unexplained, and fail to refute the fact that more than $3,000 a month is available to pay creditors in addition to the $600 excess income he acknowledges. In addition, Martin's expenses do not line up with the documents he produced, which indicate that his household chooses to spend unaccounted-for amounts on nonessential items rather than making payments to creditors.

I. **IN RESPONSE TO AHFC'S MOTION, MARTIN TWICE AMENDED HIS BANKRUPCTY SCHEDULES.**

Prior to filing his response to AHFC's motion on February 22, 2021, Martin amended his Schedules A/B, I, and J, in response to the inaccuracies detailed in AHFC's motion. Then a month later, on March 10, 2021, Martin amended his Schedule A/B for a second time. His amendments are as follows.

First, AHFC noted that based on the paystubs provided, the income reported on the Martin's Schedule I was impossibly low. While Schedule I only calls on a debtor to "estimate monthly income," the non-filing spouse's reported income of $7,794 was much less than any single paycheck (if projected out to a monthly rate), and far less than the non-filing spouse's average monthly income preceding the bankruptcy. The effect of this incorrect reporting is to disguise the household's financial well-being. The Debtor's Amended Schedule I now lists the non-filing spouse's gross income as $8,837 per month, an increase of over $1,000.

Second, AHFC noted that Schedule I's statement of expected change in income was misleading. Martin's original Schedule I indicates that "Debtor is furloughed, receiving $1,030/week unemployment compensation; does not know when, or if, employer will reopen, or what compensation will be if it does." The impression this statement creates is that Martin faced great uncertainty with his employment that had shut down and was not operating. In fact, the Rule 2004 examination of Martin revealed that his employer, Windy City Motors, was still operating, that Martin had voluntarily offered to be furloughed, and he was still providing his services during the "furlough" period in anticipation of returning to work. *See* Mem. in Support of Mot. to Dismiss ("Mem."), Ex. A, Martin Tr. at 31-36. Martin's Amended Schedule I now states that "Debtor is furloughed, receiving $1,030/week unemployment compensation." During the Rule 2004 examination, Martin also disclosed that since ending his voluntary absence (during which he received unemployment), Windy City Motors promoted him to a new role, and he was negotiating his annual salary, which he expected to be in the range of $100,000. *Id.* at 24.

Third, AHFC noted that many expenses on Martin's Schedule J were inflated or incorrect. Schedule J listed $810 for real estate taxes, despite that amount being included in his mortgage payment. Similarly, $100 was scheduled for homeowner's insurance, despite being escrowed. After review of relevant bank statements, AHFC identified "childcare and children's education" costs of $160 on average per month in the month surrounding the bankruptcy, substantially less than the $960 claimed. The amended budget reduces this expense to $610. Martin offers no explanation as to why these expenses were misstated, and even the reduced monthly amount for childcare continues to be contradicted by the documents Martin produced.

After making the change to add the spouse's correct income and reducing these inaccurate expenses, Martin simply redistributed these "found" funds to other expenses. No

3

explanation is given in his response, other than that "[t]he Debtor has made corrective amendments to his schedules, which continue to demonstrate the Debtor's real and pressing need for relief under the Bankruptcy Code." Response, ¶24. These include increasing "home maintenance, repair, and upkeep expenses" from $150 to $650, "clothing, laundry, and dry cleaning" from $200 to $350, "medical and dental expense" from $200 to $1,160, and transportation is increased from $630 to $850. In the end, Martin's amended scheduled expenses continue to show a monthly surplus of more than $600.

Finally, Martin's original Schedule A/B revealed an "[a]nticipated 2018/19 tax refund $25k (large carryovers, but withholding paid by Lara Martin)." The clear implication of this statement is that while Martin may have a legal interest in tax refunds for 2018 and 2019, he (and thus the estate) does not have an equitable interest in the funds. Once Martin produced his state and federal tax returns and gave his Rule 2004 examination, it became clear that he and his spouse had carry forward losses that meant they had no tax liability for years and were unlikely to pay any income taxes for years to come, *see* Mem., Ex. A, Martin Tr. at 44. Thereafter, Martin filed his First Amended Schedule A/B, which lists $34,955 in tax refunds for 2018 through part of 2020.

On March 10, 2021, Martin filed his Second Amended Schedule A/B that states that he is entitled to $0 of his 2018 state and federal refunds and only $4,371 of the 2019 federal refund and $2,473 of the state refund. Martin's Second Amended Schedule A/B takes the position that $28,000 of the $36,000 of refunds are attributable to withholdings generated by his non-filing spouse.

**II.     MARTIN HAS UNJUSITIFIABLY REFUSED TO PAY HIS DEBTS.**

Martin concedes that "an unjustified refusal to pay one's debts is a valid ground under 11 U.S.C. § 707(a) to deny a discharge of a bankrupt's debts." Despite his assertions that his budget is accurate and reasonable, his amended household budget as of the petition date demonstrates that, in fact, he has the ability to make payments to creditors without hardship.

### A. Martin's Over-Withholding Effectively Hides Income.

Martin argues that his $36,000 in tax refunds are not reportable income. He misses the point. AHFC does not claim that the refunds themselves are income, although they are unquestionably an asset and were not properly disclosed until AHFC identified this underreporting and Martin amended his Schedule A/B. Thereafter, Martin amended his Schedule A/B a second time in an apparent attempt to make the refunds appear as if they are not a significant asset in which he has an interest. Martin is wrong for several reasons.

First, the problem is that Martin and his non-filing spouse withheld from their paychecks – and continue to withhold from their paychecks – amounts for income tax despite knowing that they will be owe no income tax for the foreseeable future. If they were to eliminate these withholdings, they would have even greater excess income than what the amended schedules now show. Adding the $1,400 withheld amounts, to the acknowledged monthly excess of $600, results in a $2,000 monthly excess that should be used to pay creditors.

Martin cites no authority that permits a debtor to use the IRS as a savings account to accumulate funds that fall outside of the reach of the bankruptcy estate. To the contrary, debtors must account for all sources of income, and Martin's intentional withholding where no tax liability exists has the practical effect of suppressing income. Nor does the analysis change simply because Mrs. Martin has maintained the same withholding since she started her position. The Martins knew they would owe not tax due based on the fact that they carried forward $7,180

5

in tax refunds and additional business losses from 2017. A showing of fraud or improper motive is not necessary; Martin's household income leaves room for payment to creditors without an undue hardship, which makes him ineligible for bankruptcy relief.

Second, one major reason there are outsized tax refunds is because of Martin's business losses. Despite the Debtor's assertion that most of the tax refunds are attributable to his spouse, the tax refunds do not exist solely due to the non-filing spouse's withholdings. But for the fact that the Debtor had an asset, his prior net operating losses, the household would not be receiving a tax refund. While this Court, in *In Re McInerney*, held that the Withholding Rule was the best approach for determining how to allocate a tax refund in a specific case, the circumstances of this case are different in a significant way. 609 B.R. 497, 510 (Bankr. N.D. Ill. 2019) (Baer, J) (in a situation where refunds were "almost exclusively comprised of income taxes withheld from the wages of both spouses," the Withholding Rule was a "precise and fair allocation of the joint tax refunds…."). Where one spouse brings tax withholdings, and the other spouse brings a loss that negates any income tax withholding requirement for the household, both spouses should be entitled to a portion of the tax refunds.

### B. 401(k) Withholdings of 16 Percent are Unreasonable in the Context of Bankruptcy.

Martin somehow relies on *In re Wagner,* 808 F. 2d 542 (7th Cir. 1986) to support his assertion that "the amount that the Debtor's non-filing wife contributes to her 401(k) [is] not income." In doing so, Martin stretches *Wagner* beyond recognition, but more importantly, he misses the point here, too. AHFC's argument is not that Mrs. Martin's 401(k) withholdings are income, but rather that a non-filing spouse's 401(k) contribution is excessive in the context of Chapter 7 bankruptcy and should be "taken down a peg" for the household to allow repayment to creditors.

Courts routinely consider the impact of voluntary 401(k) contributions on bankruptcies, including the good faith of budgets and the conclusions of the Means Test. *E.g.*, *Hebbring v. U.S. Trustee*, 463 F. 3d 902 (9th Cir. 2006) (affirming dismissal of bankruptcy and finding that voluntary retirement contributions were not a reasonably necessary expense); *see also Craig v. Educational Credit Mgmt. Corp.*, 579 F.3d 1040 (9th Cir. 2009) (requiring fact-intensive determination as to whether voluntary retirement contributions were reasonably necessary). In doing so, bankruptcy courts assess 401(k) contributions on a case-by-case basis, viewing them within the totality of the circumstances. *See*, *e.g.*, *In re Beckerman*, 381 B.R. 841 (Bankr. E.D. Mich. 2008).

Here, the non-filing spouse contributes approximately $1,400 per month to her 401(k). Martin's household should not be allowed to seek bankruptcy relief from creditors while also excluding from income such a significant sum designated as voluntary retirement contribution. Martin's creditors shouldn't subsidize the household's retirement savings. *See In re Williamson*, 296 B.R. 760 (Bankr. N.D. Ill. 2003) ("Failure to consider the impact of the non-debtor spouse income would leave the debtor's unsecured creditors to subsidize the spouse's expenses.") (Schmetterer, J). While the reasonableness of a 401(k) contribution is determined on a case-by-case basis, a decrease to 6 percent, a common amount withheld, would free up nearly $1,000 per month in the household budget that may be used to repay creditors without hardship. This is the exact type of expense that can be "taken down a peg without hardship," as contemplated by *Schwartz*.

**C. The Debtor's New Budget Continues to Be Inaccurate and Excessive.**

Despite correcting his budget with an Amended Schedule J, Martin fails to support amounts with either the bank statements provided or through his testimony at the 2004

examination. For example, Martin's initial budget listed $960 in childcare and children's education costs. After review of the bank statements and questioning of Martin and his non-filing spouse at the Rule 2004 examination, AHFC compiled Exhibit K to its motion, a list of all identified childcare expenses in the 6 months surrounding the bankruptcy filing – a yearly school fee of $464 for registration, $350 to Debtor's elder child for what the Debtor testified as "several months' worth of babysitting." Even including extracurricular expenses, which are arguably not childcare or children's education expenses, the result was approximately $160 per month for this expense, which was listed as $960.

In the response to the Motion to Dismiss, Martin did not rebut the conclusion that this expense was inflated. Despite AHFC providing a specific list of the expenses identified as qualifying for this category, Martin did not reference this conclusion at all. Martin simply amended his budget to reduce the expense from $960 to $610 without comment.

Similarly, AHFC raised the issue of over-stated expenses as they related to the itemized "therapy" cost on the Martin's Schedule J. After review of the Martin's household bank statements in the 6 months surrounding the bankruptcy, AHFC compiled Exhibit L, a list of identified therapy costs. These expenses totaled about $750 over this period, or $125 per month, in contrast to the $750 per month scheduled. In Martin's Amended Schedule J, rather than correct this number, the Martin removes the therapy line item and seemingly includes this cost under the "medical and dental expense," which jumped from $200 to $1,160, making it more difficult to determine how much of the alleged expense is for therapy costs.

Martin does not identify expenses that AHFC missed, nor does he provide evidence of extra expenses. Martin's Response merely states that "[t]he Debtor's family's expenses for therapy are $560 per month (four sessions for four people at $35 per person), and the Debtor

8

underwent extra family/marriage counseling that would increase that amount." Response, ¶ 15. Further, Martin notes that he is now separated from his wife. *Id.* The clear implication is that the overwhelming majority of these expenses are new. Martin identifies his income as of the petition date, yet he selectively bases his expenses on events subsequent to the petition date and his Rule 2004 examination. The only logical conclusion is that Martin's scheduled therapy expense was exaggerated at the time of filing and could not be supported by the actual expenses at the time.

Finally, in addition to documents and testimony that call into question these increased expense items, Martin acknowledged in his Rule 2004 examination that before filing for bankruptcy, he often cashed his paycheck as opposed to depositing it in his bank account in order to evade his creditors. Martin testified that paycheck funds were spent to "buy groceries, pay my truck payment." Mem., Ex. A, Martin Tr. at 64. Since those items are already accounted for in the corrected budget, the only logic inference is that Martin has spent, and continues to spend his monthly paycheck on nonessential items while failing to repay his creditors. Given that Martin's household budget cannot be verified, he is not entitled to a presumption that payments to creditors would create a hardship.

### III. MARTIN'S CONDUCT MUST BE VIEWED UNDER SECTION 707(A), NOT SECTION 727 OR SECTION 523.

Martin argues that "Section 707(a) dismissals for cause should be confined to cases where grounds exist to bar a discharge under Section 727 or Section 523." Response, ¶19. This argument completely ignores *Schwartz*. In *Schwartz*, the court did not discuss either §727 or §523; rather, the case was dismissed specifically because the Debtor had ample income to repay debts without hardship. The *Schwartz* Debtors were not accused of misrepresentations or

9

concealment, or any other conduct that would trigger these other positions. Martin's position is simply contrary to the law.

Martin also argues that he "has not misrepresented any assets or sources of income." Response, ¶21. If this were true, he would not have needed to file twice-amended Schedules and make significant changes. These amendments are not a result of mere scrivener's errors – Martin significantly deflated his household income, inflated household expenses, and misrepresented his tax situation. Martin's Schedules required significant corrective amendments, and yet the household expenses continue to contradict the documents and testimony taken in this case. In short, Martin's amendments are an admission of significant misstatements of assets, income, and expenses, which disguised the financial well-being of Martin's household.

Martin's bankruptcy schedules – whether careless or deceptive – satisfy both the *Schwartz* rationale for dismissal as well as the rationales discussed by other bankruptcy courts (but which *Schwartz* declined to require). In dismissing *Schwartz*, the Seventh Circuit held that the *Schwartz* Debtors "just didn't take it down a peg so that there would be some money for their creditors." *Schwartz*, 799 F.3d at 764. Here, Martin's household is withholding large amounts for taxes not due, contributing an inordinate amount to a voluntary 401(k), and maintaining spending that can easily be taken down a peg without hardship.

### IV. THAT A SEPARATE HONDA ENTITY MAY OBTAIN A DEFICIENCY JUDGMENT SOME TIME IN THE FUTURE DOES NOT JUSTIFY DEBTOR'S CURRENT REFUSAL TO PAY CREDITORS.

Martin argues that his non-filing spouse may eventually have a judgment against her, reducing her income. Response, ¶15. Given that this has yet to occur, it would be speculative to deny AHFC's motion on this basis. Martin also argues that he does not have an adequate non-bankruptcy remedy. Response, ¶24. These arguments ignore the fact that even if Martin and his spouse are unable to work directly with his creditors to come to a resolution, the maximum

garnishment in Illinois is 15 percent. Martin would, at the very most, have $750 deducted, based on the pay stubs he produced. (Martin testified that he was negotiating for a salary increase, in which case this amount may increase, but then so would his income.) And even if Martin's spouse were to also be garnished due to a separate, not-yet-obtained Honda deficiency judgment, the maximum amount that the household could be garnished is approximately $2,075 per month. As described above, the admitted $600 monthly surplus, coupled with elimination of excessive monthly tax withholdings of $1,400 and excessive 401(k) withholdings that can comfortably be reduced by nearly $1,000 per month, and overreported monthly expenses of at least $1,000, means that Martin's household budget has at least twice as much excess as the maximum hypothetical garnishment that may someday be ordered.

If a judgment were to be entered and garnishment ordered and other verifiable changes to household expenses were to take place, then Martin might then be in a position to seek relief from bankruptcy. At this point, however, the only evidence before the Court is that Martin's household has not taken it down a peg so that there would be some money for creditors. Accordingly, AHFC's motion to dismiss should be granted and Martin's bankruptcy dismissed.

        Respectfully submitted,

        AMERICAN HONDA FINANCE CORPORATION

        /s/ Dustin B. Allen
        One of Its Attorneys

Dated: March 15, 2021

Susan Valentine (No. 6196269)
Dustin Allen (No. 6312451)
VALENTINE AUSTRIACO & BUESCHEL, P.C.
105 West Adams Street, 35th Floor
Chicago, Illinois 60603
Phone: (312) 238-8285
svalentine@vablawfirm.com
dallen@vablawfirm.com